J-S14005-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: T.W., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.W., FATHER | : | No. 52 MDA 2021 |

Appeal from the Decree Entered November 25, 2020
In the Court of Common Pleas of Tioga County Orphans' Court at No(s):
50 O.C. 2020

BEFORE:  BOWES, J., DUBOW, J., and MUSMANNO, J.

MEMORANDUM BY BOWES, J.:                              **FILED JULY 01, 2021**

C.W. ("Father") appeals from the November 25, 2020 decree that terminated his parental rights to his daughter, T.W., born in December 2014.[1] Father's counsel, James D. Smith, Esquire, filed a petition to withdraw and brief pursuant to ***Anders v. California***, 386 U.S. 738 (1967), and ***Commonwealth v. Santiago***, 978 A.2d 349 (Pa. 2009).  We grant the petition to withdraw and affirm.

The Tioga County Department of Human Services ("DHS") first became involved with T.W. in 2017 due to domestic violence and substance abuse concerns involving Father and T.B. ("Mother").  ***See*** N.T., 11/28/17, at 3-5. The juvenile court initially adjudicated T.W. dependent on December 1, 2017,

---

[1] The orphans' court entered a separate decree on the same day terminating the parental rights of T.W.'s mother.  Although the mother did not appeal that decree, she filed a brief in this matter asserting that Father's appeal is frivolous.

but it reunified the family during 2018 and subsequently terminated court supervision in February 2019.

T.W. returned to foster care later in 2019. Although our review of the certified record does not reveal the exact circumstances that triggered DHS's renewed concern, it appears that the issues of domestic violence and substance abuse reoccurred, and Father was incarcerated after he allegedly assaulted either Mother, an individual named J.H., or both. N.T., 10/3/19, at 4-7; N.T., 10/10/19, at 2; N.T., 11/19/20, at 57. The juvenile court adjudicated T.W. dependent for a second time following a hearing on October 10, 2019, and Father was released from incarceration at the end of November 2019. N.T., 10/10/19, at 5; N.T., 1/14/20, at 13.

DHS instructed Father to comply with certain services to regain custody of T.W. These services included participating in the Supporting Teaching and Educating Parents ("STEPs") parenting program and the Effective Safe Parenting ("ESP") substance abuse program, obtaining both substance abuse and psychological assessments, attending individual therapy, and completing the Men Against Abuse Program ("MAAP"). N.T., 11/19/20, at 69-71. Father failed to comply with the services. He was inconsistent with the STEPs and ESP programs and did not attend therapy. *Id*. at 70, 76. Although Father obtained a substance abuse assessment, he did not obtain a psychological assessment. *Id*. at 71-73. In addition, MAAP discharged Father due to his lack of attendance. *Id*. at 70. Father reenrolled in MAAP, but the program discharged him again. *Id*.

Moreover, the certified record indicates that Father continued to be physically violent toward Mother and engage in substance abuse. Service providers observed large bruises on Mother's body, despite her apparent efforts to hide them, and Mother acknowledged that Father hit her. N.T., 10/6/20, at 92-98, 104-06; N.T., 11/19/20, at 5-7, 10, 18, 21-22, 76-78, 92-93. In addition, Father failed to make himself available for drug screens, and he appeared to be under the influence on at least one occasion in July 2020. N.T., 10/6/20, at 74-80, 98.

On July 20, 2020, DHS filed a petition to terminate Father's parental rights to T.W. pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b). The orphans' court conducted hearings on October 6, 2020, and November 19, 2020, during which it heard testimony from T.W.'s therapist, Denise Feger, Ph.D., Mother's therapist, Deanna Fish-Layton, Father's adult child, H.W., and T.W.'s maternal grandfather, G.B.[2] In addition, numerous service providers testified in support of terminating Father's parental rights. At the conclusion of the hearing, the orphans' court announced its intent to terminate Father's rights. The court entered a decree memorializing its decision on November 25, 2020. Father timely filed a notice of appeal along with a concise statement of errors complained of on appeal in accordance with Pa.R.A.P. 1925(a)(2)(i).

---

[2] The orphans' court appointed legal interests counsel and a separate guardian *ad litem* to represent T.W. during the termination proceedings. Both attorneys supported the termination of Father's rights during the proceedings. N.T., 11/19/20, at 125-28. The guardian *ad litem* joined the brief that DHS filed in this Court. Legal interest counsel neglected to file a brief.

We begin with a discussion of Attorney Smith's petition to withdraw and *Anders* brief, which he filed in this Court on February 24, 2021. *See In re V.E.*, 611 A.2d 1267 (Pa.Super. 1992) (extending the *Anders* procedure to appeals from involuntary termination decrees); *Commonwealth v. Rojas*, 874 A.2d 638, 639 (Pa.Super. 2005) ("When faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw.") (citation and quotation marks omitted).

Counsel must adhere to the following requirements to withdraw pursuant to the *Anders* procedure:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa.Super. 2013) (*en banc*) (citation omitted). Counsel must also provide a copy of a letter advising the appellant of his or her rights to this Court. *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa.Super. 2005).

Finally, our Supreme Court has directed that *Anders* briefs comply with the following requirements:

> (1) provide a summary of the procedural history and facts, with citations to the record;

- 4 -

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, *supra* at 361.

In the instant matter, Attorney Smith avers that, upon conducting a conscientious examination of the record, he determined that Father's appeal is wholly frivolous. Counsel asserts that he mailed a copy of his petition and the *Anders* brief to Father, as well as a letter explaining Father's rights. Attorney Smith attached a copy of the letter to his petition, and the letter informed Father that he may retain new counsel or proceed *pro se* and raise any additional arguments that he deems worthy of our attention. In addition, the *Anders* brief includes a summary of the facts and procedural history of this case, a list of issues that could arguably support Father's appeal, and counsel's assessment of why those issues are frivolous, with citations to the record and relevant legal authority. Attorney Smith has, therefore, complied with the requirements of the *Anders* procedure, and we may review the issues that he has outlined in his brief. We must also "conduct an independent review of the record to discern if there are any additional, non-frivolous issues overlooked by counsel." *Commonwealth v. Flowers*, 113 A.3d 1246, 1250 (Pa.Super. 2015) (footnote omitted).

The ***Anders*** brief identifies the following claims:

1. Did the [orphans'] court abuse its discretion [in] determining that Father made no progress in addressing concerns of domestic abuse and that he did not meaningfully comply with services regarding this issue, nor did [F]ather comply with [STEPs] or [ESP] services?

2. Did the [orphans'] court abuse its discretion in determining that the best interest of the child would be for the termination to occur, and that Father's parental bond with the child was not positive?

***Anders*** brief at 8.

We consider these issues pursuant to the following standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Pennsylvania's Adoption Act governs involuntary termination of parental rights proceedings. ***See*** 23 Pa.C.S. § 2511. It requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the

- 6 -

needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's rights pursuant to § 2511(a)(1), (2), (5), and (b). We need only agree with the court as to any one subsection of § 2511(a), in addition to § 2511(b), to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the orphans' court's decision under § 2511(a)(2) and § 2511(b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

- 7 -

23 Pa.C.S. § 2511(a)(2), and (b).

We begin by addressing whether the orphans' court abused its discretion in terminating Father's rights pursuant to § 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). As this Court has explained, § 2511(a)(2) does not apply solely to instances of affirmative misconduct but also permits termination based on a parent's incapacity. *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002).

Consistent with his obligations in accordance with **Santiago**, Attorney Smith presented this Court with arguments that might support a challenge regarding § 2511(a). He observes that, while DHS presented testimony regarding allegations of domestic violence by Father, DHS's witnesses never testified that they asked Father about the allegations or gave him the opportunity to respond. **Anders** brief at 14-15. Counsel further suggests that Father's caseworkers testified that he was generally compliant with substance abuse recommendations. *Id*. at 18, 23. Finally, Attorney Smith adds that Father and T.W. have a significant relationship. *Id*. at 23-24.

The orphans' court explained its reasoning pursuant to § 2511(a)(2) as follows:

Pursuant to [§ 2511](a)(2), the [c]ourt . . . highlights that despite the provision of regular services, the numerous opportunities to participate, and substantial encouragement that has been presented to engage and meaningfully address the services, the [c]ourt cannot find that the significant concerns related to domestic violence and substance use have been addressed. It has been obvious since the commencement of the initial finding of dependency in 2017 that the issues relating to domestic violence and substance use, as well as mental health issues absolutely prevent either parent from performing the essential roles of parents related to the well-being of this child. The [c]ourt notes that despite the provision of services, and despite the efforts made to support the parents, neither parent, again, despite the opportunity, has meaningfully engaged in the education of the child, has meaningfully engaged in the therapy of the child or has otherwise meaningfully taken actions beyond visitation to support the child in her educational or other developmental needs.

Orphans' Court Opinion, 11/25/20, at 6-7.

Our review of the record supports the decision of the orphans' court. As we summarized above, DHS instructed Father to complete certain services to reunify with T.W., and he failed to comply. The services included participating in the STEPS parenting and ESP substance abuse programs. N.T., 11/19/20, at 69-70. Samantha Hewitt, Father's former caseworker, testified that he did not complete either of the programs. *Id*. at 70. She explained, "STEPs services were very brief and ceased due to non-compliance and lack of communication, within a few months of beginning. But the ESP services . . . [Father] did communicate with her some, but that wasn't consistent." *Id*. at 76. The current caseworker, Stephanie Frey, testified that Father "only started picking back up with ESP services" recently. *Id*. at 102.

DHS also instructed Father to obtain substance abuse and psychological assessments and to attend individual therapy. *Id*. at 69-73. While Ms. Hewitt testified Father obtained a substance abuse assessment, she explained that he did not obtain a psychological assessment. *Id*. at 71-73. Father "had an intake appointment" for individual therapy, but he did not attend any subsequent appointments. *Id*. at 70. Finally, DHS instructed that Father complete MAAP to address domestic violence concerns. *Id*. Ms. Hewitt reported that Father completed an assessment with MAAP, but that the program twice discharged him.[3] *Id*.

Importantly, the record is replete with testimony that domestic violence remained an ongoing problem. One example of the alleged domestic abuse was described by Stephenie Brostrom, the DHS case aide. She testified that, while listening to a June 5, 2020 voicemail from Mother, she overheard an altercation between Mother and Father. N.T., 10/6/20, at 92. She recounted that Father was "calling [Mother] names, telling her to get in the car. She's telling him: You're hurting my arm, leave me alone . . . . it sounded like she said: You broke my nose." *Id*. During a visit with T.W. five days later, Ms. Brostrom observed "a huge bruise" on the back of Mother's arm. *Id*. She

---

[3] Father produced a certificate purporting to show he completed MAAP, but Ms. Hewitt testified that the certificate was dated prior to T.W.'s current dependency. N.T., 11/19/20, at 71-72.

noted that Mother was wearing "a lot of clothes," but that "her sleeve happened to come up a little bit, and I saw it there." *Id*. at 92, 105.

Ms. Brostrom described a similar interaction with Mother on September 23, 2020, during which Mother "kept pulling her mask up to cover her face, and then bringing her hair down – but when we went outside . . . she had a huge bruise on the side of her face, where it looked like she had been hit." *Id*. at 93. DHS presented a photograph of Mother's bruise as an exhibit. *See* Agency Exhibit 3. Jill Winkler, a visitation aide, confirmed that she took the photograph and spoke with Mother about the bruise. N.T., 11/19/20, at 5-6. Mother reported to Ms. Winkler that Father had hit her. *Id*. at 6. She also expressed fear that Father, who was in a different room across the hall, might overhear their conversation and "'beat me up even more.'" *Id*. at 6-7.

Contrary to the potential argument that Attorney Smith identified in the *Anders* brief concerning whether Father had an opportunity to challenge the allegations of domestic violence, the assessment of credibility and the weight of the evidence is within the sole purview of the orphans' court. *See In the Interest of D.F.*, 165 A.3d 960, 966 (Pa.Super. 2017) ("The [o]rphans' [c]ourt is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence."). Instantly, the orphans' court accepted the testimony that DHS presented against Father regarding ongoing domestic violence. As the certified record support's the orphans' court's finding of persistent abuse, we

will not disturb it simply because DHS did not confront Father about specific incidents.

Likewise, the certified record established that substance abuse remained an ongoing problem for Father as well. Father's adult son, H.W., testified that he visited Father's home in July 2020. N.T., 10/6/20, at 74. H.W. had recently returned from a military deployment overseas and was visiting the home to retrieve some of his belongings. *Id*. at 72-73. When he arrived, H.W. observed Father in a state of agitation, and Father claimed that friends of H.W. had "been following him for the past two months." *Id*. at 74-75. Father also asserted, among other things, that a gang was after him, that the electrical outlets in his home would burn his skin when he walked past them, and that "someone broke into their house and sprayed some spray that burnt their skin[.]" *Id*. at 76-79. H.W. testified that he believed Father was under the influence at the time and noted that he observed "detoxifying drinks" in Father's refrigerator. *Id*. at 78-80. H.W. explained that the drinks were visibly labeled as detoxifiers, and that he was familiar with the drinks because he had seen other soldiers use them to get drugs out of their systems. *Id*. at 78-79.

The testimony of DHS's service providers corroborated H.W.'s concerns. Ms. Brostrom testified that she screened Father for substance abuse using drug-testing patches. She placed two patches on Father successfully in late 2019 and early 2020, both of which produced negative results. *Id*. at 98.

After the initial patches, however, she stated that she was unable to screen Father again, explaining, "since then, I have gone five different times . . . to the home. The vehicles are in the driveway. . . . [but] they do not answer the door. Even after knocking several times, they just do not answer the door." *Id*. Ms. Hewitt, the former DHS caseworker, testified that Father had been compliant with the recommendations of his substance abuse assessment, which did not recommend counseling services, but noted that some of his patches "appeared to be tampered with" or otherwise could not be tested. N.T., 11/19/20, at 86-87. Similarly, the current caseworker, Ms. Frey, testified that Father became more compliant with receiving patches in October 2020, but that "we weren't able to send them in for testing because they looked to be tampered with or he removed them himself. So, there was no consistency with the drug patches." *Id*. at 102-03. Hence, notwithstanding Father's attempt to conceal it, the evidence presented during the hearings supports the orphans' court's finding that Father failed to address the significant concerns relating to his substance abuse.

In sum, the record confirms that Father is incapable of parenting T.W. appropriately, and that he cannot or will not remedy this parental incapacity. Father's failure to comply with the necessary services, as well as ongoing domestic violence and substance abuse concerns, prevent him from providing the permanence and stability that T.W. needs. Therefore, we discern no abuse of discretion in the orphans' court's determination that DHS established the

statutory grounds to terminate Father's parental rights pursuant to § 2511(a)(2). Hence, we agree with counsel's assessment that this aspect of Father's appeal is frivolous.

We next address the orphans' court analysis pursuant to § 2511(b):

[§] 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [§] 2511(b) does not explicitly require a bonding analysis and the term "bond" is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [§] 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011) (citations and quotation marks omitted).

Attorney Smith identifies a lone issue in his brief that might support an appeal regarding § 2511(b). Specifically, he maintains that DHS's termination petition "does not appear to request termination" pursuant to that subsection. *Anders* brief at 27.

- 14 -

We discern no abuse of discretion. At the outset, we observe that § 2511(b) does not implicate the specific grounds for the termination of parental rights. In reality, those grounds are enumerated in § 2511(a)(1)-(11), and the orphans' court only performs the needs-and-welfare analysis mandated by § 2511(b) after the petitioner has established one of the statutory grounds by clear and convincing evidence. *See In re L.M.*, *supra* at 511 ("Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b) [**Other considerations.-**]"). Hence, DHS was not required to "request termination" pursuant to § 2511(b) as counsel suggests in the *Anders* brief. It was simply required to present clear and convincing evidence to sustain the determination that the termination of parental rights served "the needs and welfare of the child under the standard of best interests of the child." *Id*. As DHS averred in its petition that it believed the termination of Father's parental rights "to be in the best interest of" T.W., Father had notice that the agency would be presenting evidence as mandated by § 2511(b). *See* Petition for Involuntary Termination of Parental Rights, 7/20/20, at ¶ 7. Hence, the purported challenge to the adequacy of DHS's petition does not support this appeal.

Moreover, the orphans' court conducted the required needs-and-welfare analysis prior to terminating Father's parental rights, and our review of the

certified record supports the court's findings. The orphans' court reasoned as follows:

> Dr. Denise Feger testified . . . without objection or challenge, that there was a bond between both parents and the child. . . . However, there is also a bond clearly established between the child and her maternal grandparents, as well as the extended family within. The [c]ourt notes that while it is regrettable that the termination of parental rights will sever the bond between the parents and the child, there are adequate resources in place, including therapy and support within the extended family, to allow the child to weather the difficulties in the severance of the bond. For the [c]ourt to allow the mere existence of a bond, which in this case is clearly not positive, to control a termination, the child would continue to linger potentially between two home environments in the hope that there would be eventual resolution of the issues. The termination at this time clearly serves the child's needs as she is in a developmentally appropriate home and has access to all appropriate services to support her needs, and the current placement resource have clearly indicated a desire and willingness to provide the permanency to which the child is entitled under the law. . . .

Orphans' Court Opinion, 11/25/20, at 8-9.

As the orphans' court explained, the testimony indicated that T.W. and Father share a bond. N.T., 10/6/20, at 110-11; N.T., 11/19/20, at 13-14. T.W.'s therapist, Dr. Feger, who testified as an expert witness in the field of bonding, opined that T.W. loves Father, and that the termination of his parental rights would cause T.W. to experience a loss. N.T., 10/6/20, at 7-8, 35. She reasoned that the loss would be "significant" for T.W. "in the sense that she would have finalization [as] to whether or not she'd be going home; and then ultimately what that contact would look like with her parents moving forward." *Id*. at 35.

Nonetheless, Dr. Feger agreed that the bond between T.W. and Father is not appropriate. *Id*. at 30-34. She reported that T.W. suffers from anxiety, which improved over the course of therapy. *Id*. at 11-14. When Dr. Feger observed a recent visit between T.W. and Father, however, T.W. regressed, and "her presentation was very similar to that I saw at the onset of therapy . . . her anxiety levels were really elevated at that point." *Id*. at 16. Dr. Feger opined that reunification was not "therapeutically appropriate," and Father would need to make "a lot of progress . . . to provide an environment that's conducive to T.W. establishing and maintaining healthy attachments and decreasing anxiety levels." *Id*. at 20. Dr. Feger further testified that T.W.'s bond with Father has diminished over time, and that her primary bond is now with her maternal grandparents, who served as her foster parents. *Id*. at 15-16.

The evidence demonstrates, therefore, that involuntary termination of Father's parental rights best served T.W.'s developmental, physical, and emotional needs and welfare. T.W. does not share a necessary or beneficial bond with Father, and her primary bond is with her maternal grandparents, who, unlike Father, can provide her with the care she needs. We see no basis upon which to disturb the determinations of the orphans' court in relation to § 2511(b).

Finally, our independent review of the certified record does not reveal any non-frivolous issues that Attorney Smith overlooked. Father is not

entitled to relief. Accordingly, we grant counsel's petition to withdraw and affirm the November 25, 2020 decree terminating Father's parental rights pursuant to § 2511(a) and (b).

James D. Smith's petition to withdraw granted. Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/01/2021